# APPENDIX A

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  NAOMI BEN-PORATH,

 4                          Plaintiff(s),

 5                                      23 CV 8713 (CS)
         -vs-
 6                                      BENCH RULING

 7  VASSAR COLLEGE,

 8                          Defendant(s).
    ------------------------------------x
 9
                                  United States Courthouse
10                                White Plains, New York

11                                Friday, March 14, 2025
                                  3:15 p.m.
12

13  Before:  THE HONORABLE CATHY SEIBEL,
                        United States District Judge
14


15  A P P E A R A N C E S:

16

17  LEEDS BROWN LAW
         Attorneys for Plaintiff
18  BY:  ANTHONY ALESANDRO

19

20  BOND SCHOENECK & KING
         Attorneys for Defendant
21  BY:  MALLORY CAMPBELL

22

23

24

25
```

1              THE DEPUTY CLERK:  All rise.  The Honorable Cathy

2    Seibel presiding.  Ben-Porath v. Vassar College.

3              THE COURT:  Good afternoon, Mr. Alesandro --

4              MR. ALESANDRO:  Good afternoon, your Honor.

5              THE COURT:  -- and Ms. Campbell.

6              MS. CAMPBELL:  Good afternoon.

7              THE COURT:  You can both have a seat.

8              I am prepared to rule on the motion.  Does anybody

9    have anything to add that wasn't covered by the papers?

10             MS. CAMPBELL:  Nothing from me, your Honor, that

11   wasn't in the papers and the supplemental authority we've

12   provided.

13             MR. ALESANDRO:  Nothing from Plaintiffs, your Honor.

14             THE COURT:  All right.  Make yourselves comfortable;

15   it's going to take a few minutes.

16             The motion is Defendant's motion for a judgment on the

17   pleadings.  For purposes of the motion, I accept as true the

18   facts, although not the conclusions, set forth in the Amended

19   Complaint, which I'll call the "AC," which is ECF no. 26.

20             The facts are as follows.

21             Vassar College is a private liberal arts college

22   located in Poughkeepsie.  Since its opening in 1861, it's

23   provided campus-based, in-person education to students in

24   exchange for tuition.  Plaintiff is a former student at Vassar

25   who was enrolled as an undergraduate during the spring 2020

1  semester, and for that semester, she paid tuition in the amount

2  of $28,955.  (¶¶ 17, 44, 41, 46, 54, and 55.)  Plaintiff argues

3  that she and Vassar entered into an implied contract pursuant to

4  which Vassar would provide Plaintiff with an in-person,

5  on-campus education and access to services and facilities in

6  exchange for tuition.  (¶¶ 18-19.)  Plaintiff claims Vassar's

7  official policy documents, such as its course catalog; its

8  college regulations for 2019 to 2020 and its Ask Banner Course

9  Search and registration tool; its secondary materials, such as

10 its marketing materials, recruitment materials, social media

11 accounts, promotional materials, and the first-year handbook;

12 its past conduct and its registration process, created a

13 reasonable expectation that Vassar would provide an in-person,

14 on-campus education.  (¶¶ 52, 53, and 56-61.)

15         For example, Plaintiff notes that the course catalog

16 states "the libraries at Vassar are extraordinary and rank among

17 the very best liberal arts collections in the United States";

18 "the Vassar Farm and Ecological Preserve encompasses over 525

19 acres"; "the art department offers direct access to Vassar's

20 extraordinary collections...the Studio Art program has sculpture

21 and printmaking facilities in the Doubleday Studio Arts

22 Building, drawing studios in Ely Hall, and photography, new

23 media and video, and painting studios in New Hackensack"; "the

24 Department of Anthropology, located in Blodgett Hall, has

25 laboratories for archeology and biological anthropology, as well

1  as for digital and media sound analysis"; and that the science

2  buildings have "smart classrooms, faculty offices, labs, and

3  sophisticated instrumentation specific to each discipline."

4  That's from ¶ 50.  The Course Catalog and website also advertise

5  Vassar's athletic and fitness center, health center, counseling

6  service, LGBTQ center, and women's center.  (¶¶ 50 and 51.)

7  Further, the website describes Vassar as a "residential liberal

8  arts college," (¶ 10), and a "community of special character in

9  which people of divergent views and backgrounds come together to

10 study, work, and live in the proud tradition of a residential

11 liberal arts college."  (¶ 48.)

12        Additionally, to register for classes for the spring

13 2020 semester, Plaintiff used Vassar's Ask Banner site to search

14 for and register for her courses.  The Ask Banner site provided

15 relevant course information such as the time, physical location,

16 and instructor of the course.  The site also included a

17 drop-down menu where students could search for and select

18 courses of a specific format, such as "Classroom," "Intensive,"

19 or "Other."  The site did not provide "Online" or "Online Only"

20 as a course format option.  During the registration process,

21 Plaintiff reviewed the information, including the courses,

22 building, and room number, and selected her courses that would

23 take place on campus during the spring 2020 semester.  "¶¶ 56

24 through 60."

25        On March 12th, 2020, just a tad over five years ago,

1  Vassar closed its campus and transitioned to remote online

2  instruction for the remainder of the spring 2020 semester due to

3  the onset of the COVID-19 pandemic.  During this time, access to

4  on-campus facilities was suspended and services were provided in

5  a limited capacity or virtually.  Despite limiting Plaintiff's

6  and other students' access to campus and services, Vassar

7  retained the tuition money that Plaintiff and other students

8  paid, allegedly for those in-person services.  (¶¶ 22 and 67-70,

9  and 77.)

10          The procedural history is as follows.

11          Plaintiff commenced this putative class action on

12  October 4th, 2023, by filing her initial complaint alleging

13  breach of contract as to fees, breach of implied contract as to

14  tuition, and unjust enrichment.  Defendant answered on January

15  3rd and on the same day filed the motion to dismiss.  I denied

16  it without prejudice on January 12th for failing to request a

17  pre-motion conference, which we then had on February 15th, and

18  at which I granted Plaintiff leave to amend.  Plaintiff

19  submitted the AC on April 5th, 2024, advancing only the breach

20  of an implied contract and unjust enrichment claims.  Defendant

21  answered on April 26th, and this motion followed.

22          The standard of review for a 12(c) motion for judgment

23  on the pleadings is the same as for the 12(b)(6) motion to

24  dismiss.  *See Lynch v. City of N.Y.,* 952 F.3d 67, 75, and *Patel*

25  *v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126.

1          I won't take the time to summarize the plausibility

2   standard from *Bell Atlantic v. Twombly*, 550 U.S. 544, and

3   *Ashcroft* v. *Iqbal*, 556 U.S. 662; we should all be familiar with

4   it.

5          A court cannot resolve a 12(c) motion by weighing the

6   plausibility of competing allegations or by considering evidence

7   extrinsic to the non-movant's pleading without converting the

8   motion to one for summary judgment.  See the *Lively* case, 6

9   F.4th at 306.  But when deciding a 12(c) motion, courts consider

10  all documents that qualify as part of the non-movant's pleading,

11  including the complaint or answer; documents attached to the

12  pleading; documents incorporated by reference in or integral to

13  the pleading; and matters of which the Court may take judicial

14  notice.  That's *Lively* again, and it's actually called *Lively v.*

15  *WAFRA*, 6 F.4th 293, 306.

16          Regarding the third category, documents incorporated

17  by reference or integral to the pleading, a court may

18  nevertheless consider it where the complaint relies heavily on

19  its term and effect, thereby rendering it integral to the

20  complaint.  For a document to be considered integral, the

21  plaintiff must rely on the terms and effect of the document in

22  drafting the complaint.  Mere notice or possession is not

23  enough.  And if a document is integral, it still has to be clear

24  that there's no dispute regarding authenticity, accuracy, or

25  relevance.  *U.S. v. AECOM*, 19 F.4th 85, 106.  I may thus

1  consider Vassar's Course Catalog and the other documents on

2  which Plaintiff relied in drafting the AC.

3           I'll start with the claim for breach of implied

4  contract as to tuition.

5           Under New York law, a breach of contract claim

6  requires proof of an agreement, adequate performance by the

7  plaintiff, breach by the defendant, and damages.  *Fischer &*

8  *Mandell v. Citibank,* 632 F.3d 793, 799.  In New York, the

9  relationship between a college or university and its students is

10 "contractual in nature."  *Prusack v. State,* 498 N.Y.S.2d 455,

11 456 (App. Div. 1986).

12          And by the way, any case quotations today omit all

13 internal citations, quotation marks, footnotes, and alterations

14 unless I indicate otherwise.

15          A student plaintiff may bring a breach of contract

16 claim against an institution of higher education because an

17 implied contract arises between student and university when the

18 university accepts a student for enrollment.  *Papelino v. Albany*

19 *College of Pharmacy*, 633 F.3d 81, 93.  "The rights and

20 obligations of the parties as contained in the university's

21 bulletins, circulars, and regulations made available to the

22 student become a part of this contract."  *Vought v. Teachers*

23 *College,* 511 N.Y.S.2d 880, 881 (App. Div. 1987).  "Thus, to make

24 out an implied contract claim against a university, a student

25 must identify specific language in the school's bulletins,

1   circulars, catalogs, and handbooks which establishes the

2   particular contractual right or obligation alleged by the

3   student." *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d

4   414, 421 (S.D.N.Y. 2021). If these materials "provide for

5   certain specified services, such as, for example, a designated

6   number of hours of instruction, and the school failed to meet

7   its obligation, then a contract action with appropriate

8   consequential damages might be viable." *Paladino v. Adelphi,*

9   454 N.Y.S.2d 868, 873 (App. Div. 1982). But "in order to state

10  a claim for breach of such a contract, a student must identify

11  specifically designated and discrete promises." *Nungesser v.*

12  *Columbia,* 169 F. Supp. 3d 353, 370, (S.D.N.Y. 2016). "General

13  policy statements and broad and unspecified procedures and

14  guidelines will not suffice." *Nungesser,* 370.

15          While the Second Circuit recognizes the requirement of

16  a specific promise, *see Goldberg* v. *Pace University*, 88 F.4th

17  204, 210, it has framed the appropriate question at the motion

18  to dismiss stage in COVID tuition cases as "whether a reasonable

19  factfinder could conclude that plaintiff's allegations

20  demonstrate an implied contract to provide in-person services."

21  *Rynasko v. NYU,* 63 F.4th 186, 198. In other words, courts must

22  ask whether "a reasonable factfinder could conclude that before

23  Plaintiff enrolled in the spring 2020 semester, the parties

24  mutually intended and implicitly agreed that defendant would

25  provide generally in-person courses, activities, and services."

1  *Rynasko*, 198.  In other words, facts plausibly alleging such an

2  understanding meet the requirement of a specific promise.

3          Plaintiff claims that she and other class members

4  "entered into a contract as to tuition wherein Plaintiff paid

5  tuition and Defendant agreed to provide in-person and on-campus

6  classes, access to facilities, and services."  (AC ¶ 88.)

7  Plaintiff states that she understood that she was paying tuition

8  for an in-person experience based on documents in Defendant's

9  Course Catalog, Ask Banner tool, First-Year Handbook, College

10 Regulations, and website, as well as the availability of cheaper

11 online-only programs.  (¶¶ 90-92.)

12          Specifically, she points to statements in the Course

13 Catalog advertising Defendant's facilities, including its

14 libraries, art center, preserve, laboratories, observatory, and

15 fitness center, as well as statements regarding additional

16 facilities and services on the website.  (¶¶ 50-51.)  She also

17 relies on the regulations and the Ask Banner Course Search tool,

18 which referenced the campus and the fact that physical locations

19 for classes were identified.  (¶¶ 52 and 56-60.)  Finally,

20 Plaintiff relies on Defendant's prior conduct in providing

21 campus-based services since its opening and during Plaintiff's

22 prior semesters.  (¶¶ 54-55.)

23          In *Rynasko*, the Second Circuit held that plaintiffs'

24 "proposed complaint plausibly alleged an implied contract

25 between NYU and its students to deliver an in-person student

1  experience" based on similar materials and statements.  63 F.4th

2  at 198.  Specifically, the *Rynasko* court considered statements

3  in NYU's Course Catalog which designated classes as in-person,

4  NYU's marketing materials that advertise the benefits of an

5  on-campus experience, NYU's descriptions of its on-campus

6  services and facilities, and NYU's past course of conduct.

7          Defendant argues in its Brief, ECF no. 29, at pages

8  9-10, that past course of conduct cannot support the claim of an

9  implied contract, but *Rynasko* suggests otherwise, where it said

10  "pre-pandemic practice supports a reasonable inference that

11  in-person instruction, along with access to on-campus

12  facilities, is a norm for students enrolled in the traditional

13  on-campus program."  That's *Rynasko*, 198.

14          Defendant points out in its Reply, ECF no. 35, at page

15  45, that *Rynasko* also discussed the ways that suspension of

16  in-person services altered the experience of the plaintiff in

17  that case as a dance major, including that she no longer had

18  access to the dance studio, but that was only one factor that

19  the Court considered in reaching its decision.

20          Additionally, following *Rynasko*, courts in this

21  District have issued several decisions concluding that

22  plaintiffs met the *Rynasko* pleading standard by alleging similar

23  statements about the campus on the university's website and

24  Course Catalog without discussing the impact it had on students'

25  particular course of study.

1      For example, in *Coccaro v. Barnard,* 2024 WL 196524
2  (S.D.N.Y. Jan. 18th, 2024), Judge Oetkin found that plaintiff's
3  complaint met the standard laid out in *Rynasko* where it alleged
4  that Barnard's course catalog advertised the benefits of
5  Barnard's "residential community," that its website touted its
6  facilities and campus location, and that Barnard advertised its
7  facilities on campus as places where people could come together
8  to collaborate and engage in dialogue.  That's *Coccaro*, 3.
9  Likewise, here, Plaintiff alleged that Vassar's website stated
10 that Vassar is a "highly selective, residential, co-educational
11 liberal arts college...renowned for...the beauty of its campus"
12 and that Vassar advertised its facilities and said that it "is a
13 community of special character in which people of divergent
14 views and backgrounds come together to study, work, and live in
15 the proud tradition of a residential liberal arts college."
16 (¶¶ 47, 48, 50, and 51.)

17      In *Meng v. New School*, the Court also concluded that
18 the complaint met the *Rynasko* standard where it described the
19 university's promotional materials that touted the school's
20 on-campus resources, the value of its campus life in the heart
21 of New York City, and the benefits of on-campus course work.
22 686 F. Supp. 3d 312, 318 (S.D.N.Y. 2023).  As already discussed,
23 the AC here includes similar allegations.  Although the *Meng*
24 court acknowledged that plaintiff did not identify a specific
25 promise to provide only in-person classes and services, it

1  nonetheless held that the allegations plausibly alleged a mutual

2  expectation that students would receive generally in-person

3  courses, activities, facilities, and services."  The same is

4  true here.

5          I also note that in Defendant's Brief, ECF no. 29, at

6  page 10, note 6, Defendant oddly asserts that *Rynasko* is not

7  binding on this Court and says that this Court is reviewing a

8  lower court.  It says that on page 11.  I appreciate that

9  oftentimes there is no need to reinvent the wheel, but I urge

10 counsel to use more care in recycling briefs going forward.

11         Defendant relies on *Bergeron v. Rochester Institute of*

12 *Technology,* 2024 WL 5054841, the summary order from the Second

13 Circuit dated December 10th, 2024.  Defendant provided that in

14 its notice of supplemental authority, (ECF no. 39), to argue

15 that Plaintiff must plead "specific promises set forth in the

16 school's bulletins, circulars, and handbooks," to establish the

17 existence of an implied contract.  That's ECF no. 39, at page 1,

18 citing *Bergeron*, 1.  But in *Bergeron*, the Second Circuit was

19 reviewing the District Court's decision on a defendant's motion

20 for summary judgment, *(Bergeron*, 1), whereas it is *Rynasko* that

21 governs COVID tuition-refund cases at the pleading stage.  *See*

22 *Coccaro*, 3, and *Meng*, 317.

23         Additionally, although it's true that the District

24 Court in *Bergeron* granted the summary judgment motion, it had

25 previously denied the motion to dismiss and did so even after

1  analyzing whether plaintiff had alleged specific promises.  *See*

2  *Bergeron v. RIT*, 2020 WL 7486682, at *8 (W.D. Dec. 18th, 2020).

3  On the motion to dismiss, the District Court found that

4  plaintiff identified a "multitude of promises made by RIT

5  regarding the benefits of its in-person, on-campus program,

6  including opportunities to work directly with faculty in their

7  labs, vibrant and diverse campus life, access to superior

8  technology, and robust on-campus support."  That's the 2020

9  *Bergeron* decision at page 8.  Some of the alleged promises in

10 that decision mirror those of Vassar here.

11        For example, RIT in its admissions letter said --

12 talked about labs, technology, and computing facilities being

13 some of the finest available on any campus.  Vassar -- that's in

14 the Decision at 2.  Vassar similarly advertised smart

15 classrooms, labs, and sophisticated instrumentation, as well as

16 its observatory and specific equipment in its archeology labs.

17 (¶ 50.)  RIT's undergraduate bulletin also talked about the post

18 office, laundry rooms, computer labs, game rooms, and fitness

19 facilities, and Vassar's Course Catalog advertised its libraries

20 and fitness center and the website discussed the health service,

21 counseling service, women's center, and LGBTQ center.  (¶¶ 50

22 and 51.)  Thus, based on the similarity of the allegations in

23 the two complaints, *Bergeron* actually supports the plausibility

24 of Plaintiff's claim here.

25        Further, and perhaps most importantly, at the motion

1  for summary judgment stage in *Bergeron*, the Second Circuit did

2  not state that the representations in a university's course

3  catalog, website, or course registration portal regarding campus

4  life could not be specific promises.  Rather, the Court found

5  that Plaintiff Bergeron could not rely on those representations

6  because RIT's disclaimers in those sources negated the potential

7  promises.  See the 2024 *Bergeron* decision, 1.  Similarly, in

8  *Goldberg v. Pace University*, 88 F.4th 204, another case on which

9  Defendant relies in its Brief on page 7, the Second Circuit held

10  that the implied contract claim had to be dismissed because the

11  university's disclaimer defeated the claim, not because

12  plaintiff failed to allege specific promises.  That's *Goldberg*,

13  210-212.

14          Thus, the representations here suffice to plausibly

15  allege an implied promise for in-person instruction.

16          Vassar goes on to raise the same argument that

17  succeeded in *Goldberg* and *Bergeron*, that Plaintiff's breach of

18  implied contract claim must be dismissed because Defendant

19  "explicitly reserved the right to alter the mode of

20  instruction."  That's from Defendant's Brief at 11.

21          Defendant claims in its reply at page 2 that Plaintiff

22  failed to address the disclaimer and thus abandoned her

23  argument.  Plaintiff came perilously close to doing so.  I do

24  not know why she risked dismissal by not more directly

25  addressing the disclaimer argument, but she adverted to it

1 barely sufficiently enough in her Brief, ECF no. 34, at pages

2 8-9.

3            According to Defendant, its academic catalog contains

4 the following disclaimer:

5            "All statements contained in this catalog reflect the

6 approved policies of Vassar College as of January 21, 2017.

7 However, for educational and financial reasons, the college

8 reserves its right to change the provisions, statements,

9 policies, curricula, procedures, regulations, or fees described

10 herein.  Such changes will be duly published and distributed."

11 That's in Defendant's Brief at 11.

12            Plaintiff did not cite this language in her complaint,

13 but she does not dispute in her Opposition that that language is

14 in the academic catalog.  Because the catalog forms part of any

15 implied contract with Vassar, I may consider it.  *See Rynasko*,

16 191, note 3.

17            "A specific disclaimer in the university catalog may

18 excuse the university from a specific promise that would

19 otherwise be a contractual obligation."  *In re Columbia*, 523 F.

20 Supp. 3d 414, 425.  Such disclaimers compel dismissal of breach

21 of contract claims even when defendant's promises were breached.

22 *Aubrey v. New School,* 624 F. Supp. 3d 403, 420 (S.D.N.Y. 2022).

23            To the extent that Vassar argues that its disclaimer

24 allowed it to temporarily move classes online because of a

25 global pandemic, (see their Brief at 11), that argument "is not

1  supported by its language." *Rynasko*, 200.  A university's

2  disclaimer does not have to have listed "pandemic" as a trigger

3  to cover the actions it took to respond to COVID-19, including

4  moving classes and services online, *(see Goldberg*, 211-212), but

5  the disclaimer does have to include some language that could be

6  construed as encompassing the pandemic, such as "unforeseen

7  circumstances beyond the University's control." *Goldberg*, 212.

8          In *Goldberg*, the Court found that language covered the

9  COVID-19 pandemic because it was similar enough to specific

10 events listed in the provision, such as faculty illness,

11 malfunction of computers, unavailability of facilities

12 occasioned by damage to the premises, or school closings because

13 of inclement weather.  Vassar's disclaimer does not include a

14 catch-all provision or language regarding emergencies or

15 unforeseen circumstances, and while there certainly were

16 financial consequences of COVID-19, Defendant does not suggest

17 anywhere in its Brief that Vassar switched to online classes in

18 the spring of 2020 for financial reasons.  Accordingly, the

19 disclaimer does not bar Plaintiff's breach of contract claim at

20 this stage.

21         Defendant also argues that Plaintiff fails to state a

22 claim because she didn't plead any facts to show she suffered

23 damages arising from the breach of the alleged implied contract

24 because she got her degree "without any delay or impediment."

25 Defendant's Reply at 5-6.  I disagree.  Plaintiff contends that

1  pursuant to the alleged implied contract entered into by the

2  parties, Vassar agreed to provide an on-campus education and

3  experience, not just a degree.   (*See, e.g.,* ¶¶ 74-76 of the AC.)

4  "The fact she received some benefit from the contract (i.e.,

5  credit toward her degree) does not establish that she received

6  the full value of the contract originally bargained for."  *Meng*,

7  322.  At this stage, by pleading she did not get the services

8  for which she paid, (*see, e.g.,* ¶¶ 74-78), Plaintiff has alleged

9  that she was damaged.

10         Accordingly, the motion for judgment on the pleadings

11 is denied as to the breach of implied contract claim.

12         In the alternative, Plaintiff brings a claim for

13 unjust enrichment.

14         Under New York law, a plaintiff has to show the

15 defendant was enriched at the expense of the plaintiff and that

16 it would be inequitable to permit the defendant to retain that

17 which is claimed by the plaintiff.  *Reynolds v. Lifewatch*, 136

18 F. Supp. 3d 503, 524 (S.D.N.Y. 2015).  The essence of an unjust

19 enrichment claim is that one party has gotten money or a

20 benefit at the expense of another.  *Kaye v. Grossman*, 202 F.3d

21 611, 616.

22         The law in New York is clear that "unjust enrichment

23 is not a catch-all cause of action to be used when others fail."

24 *Corsello v. Verizon*, 18 N.Y.3d 770, 790.  Rather, "it is

25 available only in unusual situations when, though the defendant

1  has not breached a contract nor committed a recognized tort,

2  circumstances create an equitable obligation running from the

3  defendant to the plaintiff.  Typical cases are those in which

4  the defendant, though guilty of no wrongdoing, has received

5  money to which he or she is not entitled.  An unjust enrichment

6  claim is not available where it simply duplicates or replaces a

7  conventional contract or tort claim." *Corsello*, 790.

8          "Courts in this district have previously dismissed

9  unjust enrichment claims that were indistinguishable from

10  contract claims pleaded in the alternative in the same

11  complaint, at least where the parties did not dispute that they

12  shared a contractual relationship." *In re Columbia*, 430

13  (collecting cases), *aff'd* 2024 WL 2764146, a summary order from

14  May 30th, 2024.  That *Columbia* case, by the way, is 523 F. Supp.

15  3d 414.

16          Plaintiff's unjust enrichment claim here rests on the

17  same factual allegations as her contract claim, *in re Columbia*,

18  430; that Defendant wrongfully retained Plaintiff's tuition

19  after failing to deliver the educational product and campus

20  services it was allegedly contractually bound to provide.

21  (*Compare* ¶¶ 188 and 117 with ¶¶ 127 and 130-32.)  Plaintiff also

22  seeks in both claims to recover at least a portion of the

23  tuition paid for the spring 2020 semester.  (*Compare* ¶ 119 with

24  ¶ 148.)  In substantially similar cases applying New York law,

25  courts in this District have found breach of contract and unjust

1  enrichment claims indistinguishable and dismissed the unjust

2  enrichment claims as duplicative.

3           "In support of her unjust enrichment claim, Plaintiff

4  asserts that she and the putative class members conveyed money

5  to the university in the form of tuition and fees for on-campus

6  instructions and facilities that the defendant did not provide

7  and is not providing.  These are the same factual allegations

8  underpinning Plaintiff's claim for breach of contract and

9  Plaintiff offers no explanation as to how the unjust enrichment

10 claim differs from the contract claim.  Thus, Plaintiff's unjust

11 enrichment claim is dismissed as duplicative."  That's *Zagoria*

12 *v. NYU*, 2021 WL 1026511, at *5 (S.D.N.Y. Mar. 17th, 2021); *see*

13 *In re Columbia,* 523 F. Supp. 3d at 430; *Amable v. New School,*

14 2021 WL 3173739, at *12 (S.D.N.Y. Jul. 27th, 2021); and *Fedele*

15 *v. Marist*, 2021 WL 3540432, at *7-8 (S.D.N.Y. Aug. 10th, 2021).

16 I find these authorities persuasive and I follow suit.

17          Plaintiff argues she can maintain the unjust

18 enrichment claim in the alternative, and while it's true that a

19 plaintiff can plead in the alternative at this stage, "it is

20 equally true that even pleaded in the alternative, claims for

21 unjust enrichment will not survive a motion to dismiss where

22 plaintiff fails to explain how the unjust enrichment claim is

23 not merely duplicative of the other causes of action."  *Nelson*

24 *v. MillerCoors*, 246 F. Supp. 3d, 666, 679 (E.D.N.Y. 2017); *see*

25 *Corsello*, 790, and *in re Columbia*, 430.

1          Additionally, where the parties agree that the

2    contract covers the subject matter at issue and instead dispute

3    only the terms of the agreement, Plaintiff cannot maintain an

4    unjust enrichment action in the alternative.  *Goldberg*, 215.

5    And Plaintiff concedes as much in her Brief at page 3.  Here,

6    Defendant does not dispute that an implied contract exists

7    between the parties, but, rather, argues that the terms of the

8    contract didn't include a specific promise of in-person

9    instruction.  (Defendant's Brief, 12.)

10          Thus, Plaintiff has not shown that her unjust

11   enrichment claim is not duplicative and she cannot maintain it

12   even in the alternative, and it is therefore dismissed.  I

13   therefore don't have to reach the other issues regarding that

14   claim that the parties briefed.  *See Yodice v. Touro*, 2024 WL

15   3466546, at *3 (2d Cir. Jul. 19th, 2024) and *Hoffman v. LIU*,

16   2024 WL 3262819, at *1 (2d Cir. Jul. 2nd, 2024), both dismissing

17   unjust enrichment claim as duplicative of breach of contract

18   claims.

19          So the motion is granted in part and denied in part.

20   It's granted as to unjust enrichment and denied as to breach of

21   contract.  The Clerk of Court is to terminate Motion No. 28.

22          Now we have to set dates for the remainder of

23   discovery.

24          If I remember correctly, you folks have done paper

25   discovery, so all that's left are depositions and then any

1    follow-up interrogatories or requests to admit.  Am I right

2    about that?

3            MR. ALESANDRO:  I think we are still waiting on some

4    document productions.  We have the responses, but I believe

5    we're looking for some from Defendant still.

6            THE COURT:  Wow.  Let me go back and look at the

7    scheduling order that I entered.  I guess I didn't order a

8    formal one, but at some point, I said you should go ahead with

9    paper discovery.  Let me find it.

10            (Extended pause)

11            THE COURT:  I guess it was when we were last here,

12    June 27th.  And I said that you should submit a schedule, which

13    you did, which I approved on July 10th, 2024.  I can't imagine

14    that that schedule said it was okay to still have outstanding

15    document requests this late in the game.  Let me see what it

16    said.  Let's see, that was ECF no. 38.

17            So what the parties proposed, and what I approved,

18    initial disclosures and discovery requests July 31st, additional

19    -- initial production of documents from Vassar August 30th,

20    formal responses to discovery requests September 30th, 2024, so

21    why are we in March of 2025 and there are still outstanding

22    documents?  That, I don't understand.

23            I don't understand, Ms. Campbell, why you still owe

24    documents; I don't understand, Mr. Alesandro, why you didn't let

25    me know that they were this far behind the ball.

Bench Ruling          Ben-Porath v. Vassar

1          Does somebody want to -- why don't you go first, Ms.

2    Campbell, and tell me why why you haven't made production.

3          MS. CAMPBELL:  Sure.

4          We did provide our written document responses and I

5    believe we have documents that we can produce pretty imminently,

6    and we apologize for any delay and we can get those out, but --

7          THE COURT:  Well, why six months after they should

8    have been provided have they not been provided?

9          MS. CAMPBELL:  I'm not sure, your Honor.  I apologize.

10          THE COURT:  And Mr., Mr. Alesandro, did you guys sit

11    on your hands and not do anything?

12          MR. ALESANDRO:  I don't have a good answer for you,

13    your Honor.

14          THE COURT:  Well, if that's because each of your

15    clients sent somebody who was not fully familiar with the case,

16    everybody needs to go back and read the Rules of Civil

17    Procedure.  If that's a way of saying there's no excuse, then

18    that's what I want to hear, not "I don't know."

19          I don't want this to happen again.  Nobody should show

20    up here not knowing everything reasonably they should know about

21    the case.  Unless you had some belief -- even if you had some

22    belief that I was going to dismiss the whole case, you had to

23    know that I might not and that discovery was going to come up

24    today, so the fact that neither of you are prepared is

25    disappointing.

1          So here's what I'm going to order.  Any outstanding

2    documents have to be produced by Defendant by March 21st, 2025.

3    And now we have to talk about the remainder of the schedule.

4          What depositions are you expecting?

5          MR. ALESANDRO:  We would probably expect three to five

6    depositions of various individuals within the university.

7    Usually, we'd like someone from, like, an admissions department,

8    someone from an enrollment department, maybe a higher-ranking

9    official like a president or something along those lines.

10   Usually, we can get it done in about three to five depositions,

11   depending on the answers.

12         THE COURT:  And, Ms. Campbell, who are you looking at

13   besides the Plaintiff?

14         MS. CAMPBELL:  I believe just the Plaintiffs, your

15   Honor.

16         THE COURT:  What's a reasonable time frame to get four

17   to six depositions done?

18         MR. ALESANDRO:  Based on the availability of the

19   witnesses, I think we can realistically get it done in the next

20   90 to 120 days.

21         THE COURT:  I was thinking ninety, so let's see.  June

22   16th for all depositions, all fact discovery to be completed by

23   July 16th.

24         I like to have a one-month cushion between the end of

25   depositions and the end of all discovery because lawyers being

1  lawyers, they will leave the depositions to the last minute and

2  then if there's follow-up, they won't have left themselves time.

3  I'll have the same June 16th date be the date to propound

4  requests to admit and further interrogatories.

5          Is anybody contemplating expert discovery in this

6  case?

7          MR. ALESANDRO:  Yes, your Honor.

8          THE COURT:  What kind of experts?

9          MR. ALESANDRO:  So what we have seen in other cases

10 is, typically they come up with some sort of damage model based

11 on whatever formula they use and so the briefing depositions and

12 counter-briefing from Defendant's expert versus Plaintiff's

13 expert.  Typically --

14         THE COURT:  Does it make sense to have motions before

15 -- well, no, I'm -- as I'm saying it, I'm taking it back,

16 because what I think will happen is what's happened in every

17 single one of these cases, is that you're going to settle and

18 you need those expert depositions in order -- or those expert

19 reports in order to do that.

20         So I will set the expert discovery cut-off for --

21         MR. ALESANDRO:  If I may, your Honor, briefly?  And

22 it's obviously up to you, but typically what we like to do is

23 put the expert deadlines after a motion for class certification,

24 just so neither party has to bear the expense of that before we

25 know whether a class is certifiable, and it hasn't been a huge

1  --

2          THE COURT:  But this -- aren't these classes always

3  certifiable?

4          MR. ALESANDRO:  From our perspective, yes.

5          THE COURT:  I mean, I'll -- let me ask Ms. Campbell.

6          Has a class -- except for cases that settle before

7  they get to it, has -- is there a COVID college case that hasn't

8  been appropriate for class certification according to a judge?

9          MS. CAMPBELL:  I think it depends on the scope of the

10  class.  I've seen where, you know, a certain major's trying to

11  represent a larger group or a grad student's trying to represent

12  undergrad and grad, but I don't believe that we have that issue

13  in this case.

14          THE COURT:  Well...

15          MR. ALESANDRO:  And I would --

16          THE COURT:  I'm going to set the expert discovery

17  cut-off at September 16th, and you can let me know when you want

18  to make a motion for class certification.  You don't have to

19  wait for the close of fact discovery to do it, I imagine you

20  have what you need based on the documents, and I don't even

21  think there's a need for a pre-motion letter, so I'll -- I have

22  a pre-motion letter requirement in my rules, but I'm going to

23  waive it for the class certification motion.  All you have to do

24  is just send me a letter with a proposed briefing schedule that,

25  hopefully, you've agreed on.

1          MR. ALESANDRO:  Thank you, your Honor.

2          THE COURT:  And let me ask Mr. Clark to find us a

3  conference date in the latter part of September.

4          (Brief pause)

5          THE COURT:  While he's doing that, let me alert you to

6  a pet peeve of mine, and that is requests for discovery

7  extensions that come on the eve of the cut-off or, worse yet,

8  after the cut-off.

9          I understand sometimes you have a good reason why you

10  need an extension; your client's in a coma, you have a two-month

11  trial.  Whatever it is, if you have a good reason why you need

12  an extension and you bring it to my attention when you know

13  about it, I will be reasonable and you will get your extension,

14  but if I get a letter, you know, a week before the fact

15  discovery cut-off and you tell me, oh, you know, well, we're

16  still working on deposition dates, that's going to tell me that

17  you haven't been paying attention to the case, and if I think

18  you haven't been paying attention to the case or you haven't

19  been diligent or you just don't have a good reason why you

20  didn't complete the discovery in the time allotted, I tend to

21  say no.

22          You'll see in my scheduling order in paragraph 7 that

23  I have a procedure you should follow if the other side's not

24  playing ball.  It requires you to bring discovery delays to my

25  attention on a pretty tight timeline.  Same rule applies if it's

1  a third party that's not playing ball.  That tight timeline is

2  in there because I want to get involved and keep you on track,

3  so if you come in at the next conference and you tell me, well,

4  I couldn't depose so-and-so because so-and-so still owes me

5  documents, I'm going to say, well, so-and-so is in the doghouse

6  for not providing the documents, but you're in the doghouse for

7  not bringing it to my attention as required and therefore you're

8  out of luck.

9            I mention this not because I expect any problems in

10 this case; I say it every time I enter a scheduling order,

11 because once in a while, lawyers come in at that next conference

12 and they think -- they act surprised that I thought my

13 scheduling order was an order when they thought it was more like

14 a suggestion, so I always like to let the lawyers know my

15 opinion on that subject.

16           Let's see what Mr. Clark found for a conference date.

17           THE DEPUTY CLERK:  Yes, Judge.  September 25th, 2025,

18 at 11:15 a.m.

19           THE COURT:  All right, that will be in person.

20           If anybody is thinking about a motion at that time,

21 let me have the pre-motion letter on 9/11 and the opposition on

22 9/18, and we'll talk about it on 9/25.  The scheduling order

23 will go up on the docket probably Monday.

24           Unless this is the first of the hundreds of college

25 cases to go to trial, I know you're going to end up settling.

Bench Ruling              Ben-Porath v. Vassar

```
 1  It seems like you should do it before you spend a lot of money.
 2  If you think a mediator or a magistrate judge would be helpful
 3  in that regard, let me know; I'm happy to refer you.  Otherwise,
 4  I'll see you in the fall.
 5          Is there anything else we should do now?
 6          MR. ALESANDRO:  Nothing further, your Honor.
 7          MS. CAMPBELL:  Nothing, your Honor.  Thank you.
 8          THE COURT:  All right, everybody have a good weekend.
 9          MR. ALESANDRO:  Thank you, your Honor.
10          MS. CAMPBELL:  Thank you.
11          Certified to be a true and accurate transcript.
12
13          _____
14          TABITHA DENTE, RPR, RMR, CRR
15          OFFICIAL COURT REPORTER
16
17
18
19
20
21
22
23
24
25
```